Anderson E. LANDRUM, Petitioner,

v.

AIR AMERICA, INC., and Director, Office of Workers' Compensation Programs, U. S. Department of Labor, Respondents.

No. 75–1534.

United States Court of Appeals, Fifth Circuit.

June 24, 1976.

James W. Nobles, Jr., Jackson, Miss., for petitioner.

William J. Kilberg, Sol. of Labor, George M. Lilly, Linda L. Carroll, Marshall H. Harris, U. S. Dept. of Labor, Washington, D. C., for Dept. of Labor.

Thomas H. Suttle, Jr., Jackson, Miss., for Air America, Inc.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

While working in Vietnam in 1968, the claimant-petitioner, Anderson E. Landrum, sustained accidental injuries in the course of his employment for Air America, Inc. As a result of these injuries, he was permanently and totally disabled. Landrum now challenges a decision of the Department of Labor's Benefits Review Board affirming an administrative law judge's determination that petitioner's award under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.,* is to be computed in accordance with the formula set forth in 33 U.S.C. § 910(h)(1). Our examination of the Act's literal language and its legislative history reveals that Congress intended that total permanent disability resulting from injuries occurring at the time of Mr. Landrum's accident are to be

compensated pursuant to section 910(h)(1). Therefore, we affirm the decision of the Benefits Review Board.

## I. THE LONGSHOREMEN'S AND HARBOR WORKERS' ACT

In the Defense Base Act, 42 U.S.C. § 1651 *et seq.,* Congress provided that disabled employees in Anderson's position are to benefit from the provisions of the Longshoremen's and Harbor Workers' Compensation Act. This latter legislation, amended in 1972, after the date of petitioner's 1968 accident, provides in section 908(a) that

> [i]n case of total disability adjudged to be permanent 66⅔ per centum of the [claimant's] average weekly wages shall be paid to the employee during the continuance of such total disability." 33 U.S.C. § 908(a).[1]

There is, however, an absolute limit on the maximum weekly payment calculated pursuant to section 908(a). The 1972 amendments to the Act, Pub.L. 92–576, raised this payment ceiling so that as of October 1, 1975, the award figured under section 908(a) cannot exceed 200% of the "applicable national average weekly wage." [2] 33 U.S.C. § 906(b). The "applicable national average weekly wage" is determined once a year by a Secretary of Labor. The Secretary's annual calculations are based on the average weekly earnings of production or nonsupervisory workers on private nonagricultural payrolls. *See* Education and Labor Committee, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, H.R.Rep.No.92–

1441, 92d Cong., 2d Sess., at 15 (1972), U.S. Code Cong. & Admin.News 1972, p. 4698. Under the new limits, for example, if the national average weekly wage were $150, then the maximum weekly payment for a qualifying employee would be $300 (200% of $150).

In order to offset the effects of inflation, the 1972 amendments created an adjustment mechanism which annually increases a claimant's past award by the annual percentage increase, if any, in the national average weekly wage. 33 U.S.C. § 910(f) & (g).[3] Finally, in 1972 Congress passed the section directly in controversy here, 33 U.S.C. § 910(h). That section states in pertinent part:

> Not later than ninety days after the date of enactment of this subsection, the compensation to which an employee or his survivor is entitled due to total permanent disability or death which commenced or occurred prior to enactment of this subsection shall be adjusted. The amount of such adjustment shall be determined in accordance with regulations of the Secretary by designating as the employee's average weekly wage the applicable national average weekly wage determined under section 906(b) of this title and (A) computing the compensation to which such employee or survivor would be entitled if the disabling injury or death had occurred on the day following such enactment date and (B) subtracting therefrom the compensation to which such employee or survivor was entitled on such enactment date; except that no such

1. Although of no importance to our decision here, we note that the manner for computing an individual's "average weekly wages" is found at 33 U.S.C. § 910(a)–(e).

2. Before the 1972 amendments, 33 U.S.C. § 906(b) limited the maximum award to $70 notwithstanding that 66⅔% of an injured person's average weekly wages, *see* 33 U.S.C. § 908(a), might otherwise have entitled him to an award in excess of $70.00.

3. 33 U.S.C. § 910(f) & (g) require:
   (f) Effective October 1 of each year, the compensation or death benefits payable for permanent total disability or death arising out of injuries sustained after the date of

> enactment of this subsection shall be increased by a percentage equal to the percentage (if any) by which the applicable national weekly wage for the period beginning on such October 1, as determined under section 906(b) of this title, exceeds the applicable national average weekly wage, as so determined, for the period beginning with the preceding October 1.
>   (g) The weekly compensation after adjustment under subsection (f) of this section shall be fixed at the nearest dollar. No adjustment of less than $1 shall be made, but in no event shall compensation or death benefits be reduced.

employee or survivor shall receive total compensation amounting to less than that to which he was entitled on such enactment date.

Although the question of when section 910(h)(1) applies is vigorously disputed by the parties, there is no disagreement as to the actual operation of the provision. When applicable, section 910(h)(1) substitutes the national average weekly wage for the individual claimant's actual average weekly wage for purposes of calculating the award under section 908(a) (66⅔% of the average weekly wages). *See* H.R.Rep.No. 92–1441, *supra.* Therefore, any disabled employee whose award is figured pursuant to section 910(h)(1) and whose average weekly wage exceeds the national average weekly wage will receive less money if section 910(h)(1) with its reliance on the national average weekly wage is used than he would receive if his section 908(a) benefits were based solely on his average weekly wage. For example, if an individual's average weekly wage is $200 and the national average weekly wage is $150, then under section 908(a) the claimant would be entitled to $133.34 (66⅔% of $200). However, if section 910(h)(1) is applicable, then the national average weekly wage ($150) is deemed to be the injured party's average weekly wage and the section 908(a) amount is only $100 (66⅔% of $150).[4] Thus, it is advantageous for those with average weekly wages greater than the national average weekly wage to avoid the operation of section 910(h)(1) when benefits are calculated. However, 33 U.S.C. § 910(h)(3) requires that whether the initial base payment for disability is calculated using the national average weekly wage or the individual's average weekly wage, all successful claimants are to enjoy the benefit of the section 910(f)[5] annual adjustment reflecting the year's percentage increase in the national average weekly wage.

## II. THE LEGAL ISSUE

Both the Administrative Law Judge and the Department of Labor's Benefit Review Board, from whose decision this appeal was taken, concluded that since petitioner's injury occurred in 1968, four years before the passage of the 1972 amendments, section 910(h)(1) was applicable to the determination of his benefits. Anderson's average weekly wage was $480.00. Although we are not told the exact amount of the national average weekly wage at the time of the Review Board's opinion, the figures submitted by counsel clearly evidence the fact that the national average weekly wage was substantially less than Anderson's $480.00 average weekly wage. Realizing the loss of benefits he would suffer as a result of the substitution of the lower national average weekly wage for his $480.00 average weekly wage, petitioner asserted that section 910(h)(1) should not be utilized in his case. The administrative law judge and the Benefits Review Board rejected this contention.

Petitioner's position is without merit. First, the unambiguous language of section 910(h)(1) indicates that that provision affects "the compensation to which an employee . . . is entitled due to total permanent disability . . . which *commenced or occurred prior to enactment* [1972] *of this subsection . . . .*" [emphasis added].

Anderson seeks to avoid this language by reference to section 910(h)(3), discussed earlier in the opinion, which states:

> For the purposes of subsections (f) and (g) of this section an injury which resulted in permanent total disability or death which occurred prior to the date of enactment of this subsection shall be considered to have occurred on the day following such enactment date.

Petitioner's reliance on this provision is misplaced. As appears, section 910(h)(3) applies "[f]or purposes of subsections (f) and (g)"

---

4. The above example does not follow exactly the computational steps prescribed in section 910(h)(1) but rather it is intended as a simpli-

fied presentation of the potential impact of that section on a claimant's award.

5. *See* note 3 *supra.*

and not for purposes of section 910(h)(1). Section 910(h)(3) is necessary to effectuate the Congressional intent that *all* awards, post and pre-amendment, shall be adjusted annually whenever the national average weekly wage increases. In other words, section 910(h)(3) serves as part of the inflation off-set mechanism. But it does not affect the computation of the basic award to which yearly adjustments are added. The literal language of section 910(h)(3) indicates this limited role, and the petitioner has presented nothing which in any way undermines this conclusion.[6]

Second, petitioner's argument would render section 910(h)(1) superfluous. If that section does not apply to the calculation of pre-amendment injuries, then it has no role—or at least petitioner suggests none and we can find none. We will not lightly impute to Congress the intent to write a meaningless provision.

Finally, the Congressional history of the amendments evidences a clear and unequivocal intent that those injured before and after the 1972 amendments should be treated differently. The following questions and answers entered into the record by Representative Steiger, a proponent of the 1972 amendments, are relevant.

Q. Are adjustments the same for persons injured prior to enactment?

A. They too will get adjustments, but the mechanism is slightly different. If a person injured prior to enactment of the amendments was awarded the maximum benefits allowed under law at the time of injury, the Secretary, upon enactment, will consider his weekly wage to be the national average weekly wage, and will compute his benefits accordingly treating him as though he had been injured just after enactment. Each year thereafter, his compensation will be adjusted in pro-

portion to any increase in the national average weekly wage, just as employees injured subsequent to these amendments.

Q. How will the initial adjustments for persons injured prior to the enactment of the amendments be financed? Benefits for post enactment injuries can be covered by insurance, but insurance cannot be retroactive.

A. The "special fund" now provided for in the Act serves primarily as a "second injury fund." The fund is now financed by death benefit payments where there is no survivor and by fines and penalties levied under the Act. The proposed amendments would strengthen the financing of the fund by providing for assessments against carriers and self-insured employers.

The amendments provide that 50 percent of the cost of the initial and annual adjustments made in the benefits of persons injured prior to enactment of the bill will be paid from the "second injury fund." Thus these costs will be borne by the covered industries as a whole. The fund will be beefed up by an immediate interest-free Government loan which must be paid back within 5 years from the fund on a schedule arranged by the Secretary of Labor. The other 50 percent of the adjustment costs will be funded directly by the Government through appropriations. 118 Cong.Rec. 36385, 36386 (1972).

Synoptic and benevolent legislation such as we confront here does not always mandate equal treatment for all those within its scope. Having scrutinized the language and history of the 1972 amendment and having discerned a clear Congressional desire that benefits for injuries occurring before 1972 be calculated pursuant to section 910(h)(1), we conclude that claimant's posi-

---

**6.** The Senate Report accompanying the amendments explains:

Subsection (h)(3) provides that all injuries which caused death or permanent total disability occurring before the enactment of the bill would be considered to have occurred after the enactment of the bill for purposes of

the yearly increases in payments provided for in this section.

Committee on Labor and Pubic Welfare, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, S.Rep.No.92–1125, 92d Cong., 2d Sess., at 22 (1972).

tion is without merit. The decision of the Benefits Review Board is affirmed.

AFFIRMED.