561 F.2d 632
 DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,
v.
EASTERN COAL CORPORATION, Respondent.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,
v.
ELKHORN JELLICO COAL COMPANY and Old Republic Companies, Respondents.
 Nos. 76-1895 and 76-1896.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 1, 1976.
Decided July 18, 1977.
 
 William J. Kilberg, Sol. of Labor, Laurie M. Streeter, Associate Sol., Harry L. Sheinfeld, Frank A. White, Mark E. Solomons, U. S. Dept. of Labor, Washington, D. C., for petitioner in both cases.
 General Counsel, Benefits Review Bd., U. S. Dept. of Labor, Washington, D. C., for Government Appeal in both cases.
 Robert E. Helm, Ypsilanti, Mich., John H. Baird, Pikeville, Ky., for Government Appeal in 76-1895.
 John L. Kilcullen, Kilcullen, Smith & Heehan, Washington, D. C., for respondent in 76-1895.
 J. W. Craft, Jr., Craft, Barret, Haynes & Ward, Hazard, Ky., Halbert W. Kunz, Indianapolis, Ind., for respondent in 76-1896.
 Before WEICK, EDWARDS and PECK, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 These are consolidated appeals brought by the Director of the Office of Workers' Compensation Programs of the United States Department of Labor. The appeals are brought for and on behalf of the Secretary of Labor and two disabled coal miners who had been awarded benefits after administrative hearings under the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901-41 (Supp. V, 1975), amending 30 U.S.C. §§ 901-36 (1970). The Benefits are currently being paid by the Department of Labor, but the Department contends that respondent coal companies are liable for them.
 
 
 2
 The three questions of substance, as we see them, posed by these appeals are:
 
 
 3
 1) Did the Benefits Review Board and does this court have jurisdiction to hear these appeals?
 
 
 4
 2) Does the Director of Workers' Compensation Programs of the United States Department of Labor have standing to prosecute these appeals?
 
 
 5
 3) Was the Benefits Review Board correct in dismissing the appeals before it because, in spite of objections, each case had been heard by a hearing officer who was not a qualified Administrative Law Judge under 5 U.S.C. § 3105 (1970)?
 
 
 6
 We hold that the Benefits Review Board had and this court has jurisdiction of the appeals, that the Director does have standing to prosecute these appeals, and that the Board erred in vacating the awards for want of hearings before Administrative Law Judges because Congress specifically authorized the use of non-Administrative Law Judge hearing officers in the years in question.
 
 THE CASES AT ISSUE
 
 7
 Although the two cases are not before us upon the merits, their nature has a bearing upon the proper interpretation of the legislative and regulatory enactments which are in dispute.
 
 The James Large Claim
 
 8
 James Large had worked almost fifty years in the coal mines when he quit his employment with Eastern Coal Corporation in 1965. After passage of the Black Lung Benefits Act of 1972, he filed a claim for black lung disability benefits on September 17, 1973. On notice of the claim, Eastern Coal denied liability and the case was heard, over Eastern's objection, by a Department of Labor hearing officer who was not an Administrative Law Judge appointed under 5 U.S.C. § 3105. The hearing officer found Large was totally disabled due to pneumoconiosis arising out of his coal mine employment and that Eastern Coal was liable for benefits to Large under the Black Lung Benefits Act. Eastern Coal appealed and the Benefits Review Board vacated the award and remanded the case for hearing because the hearing officer had not been a qualified Administrative Law Judge under § 3105.
 
 The Mossie Graham Claim
 
 9
 Mossie Graham had worked nearly forty years in the coal mines when he quit his job with Marlowe Coal Company in 1949. When the Black Lung legislation was passed, he too filed a claim under the Act on July 11, 1973. The Elkhorn-Jellico Coal Company (into which Marlowe Coal Company had merged) was notified of possible liability and refused to accept same, whereupon a hearing was held. Over Elkhorn's objection, the claim was heard before a Department of Labor hearing officer who was not an Administrative Law Judge qualified under 5 U.S.C. § 3105. The hearing officer found that Graham was entitled to benefits and that Elkhorn-Jellico was liable under the Act. Elkhorn-Jellico appealed this decision to the Benefits Review Board which vacated the decision and remanded for rehearing because the claim had not been held before an ALJ qualified under § 3105.
 
 
 10
 The Director determined under the Act that the Department of Labor should pay both claims pending review and brought these appeals to resolve the third stated legal question as predicate for determination of liability. Respondents, coal companies, raise the first and second stated questions as alternative grounds for dismissing the appeal or affirming the Board's vacation of the awards of benefits to claimants.
 
 THE STANDARD OF INTERPRETATION
 
 11
 Before turning to the legal disputes which we must resolve in these cases, we note the history and purposes of this legislation. From the founding of the republic until recent years, coal was the main source of energy for this nation's homes and work places. It may well be again. For most of that history underground mining was required to produce the coal. The miners who daily descended hundreds, sometimes thousands, of feet into the shafts and tunnels of the deep mines, first became objects of public and Congressional concern because of the recurring tragedies caused by explosions of coal gas which over the years killed thousands of miners. An American public and the United States Congress, which repeatedly saw the pithead pictures of surviving miners with coal blackened faces and hands, reacted to explosion shattered bodies and lives with mine safety legislation. Federal Coal Mine Safety Act Amendments of 1965, Pub.L. No. 89-376, 80 Stat. 85; Act of July 16, 1952, ch. 877, 66 Stat. 692; Act of May 7, 1941, ch. 87, 55 Stat. 177; Act of March 3, 1915, ch. 95, 38 Stat. 959; Act of Feb. 25, 1913, ch. 72, 37 Stat. 681; Act of May 13, 1910, ch. 240, 36 Stat. 369.
 
 
 12
 For many years, however, little was known about the physical damage which underground miners suffered from breathing coal dust. Finally, pneumoconiosis was recognized as a disabling and deadly disease. In 1969 the United States Congress provided the first remedial legislation.
 
 
 13
 This Circuit, which encompasses extensive mining areas in Eastern Kentucky, Eastern Tennessee, and Southern Ohio has already had occasion to note Congressional concerns and purposes in regard to the Black Lung Acts of 1969 and 1972:
 
 
 14
 "The present black lung (pneumoconiosis) law is a combination of two statutes. The Coal Mine Health and Safety Act, Pub.L. No. 91-173, 30 U.S.C. § 801 et seq. (1970), was adopted in 1969. Its stated purpose included these sentences:
 
 
 15
 '(C)ountless thousands (of coal miners) have suffered and died or presently suffer from the ravages of coal workers' pneumoconiosis the dread miners disease caused by the inhalation of excessive amounts of coal dust.
 
 
 16
 'It is the purpose of the bill H.R. 13950 to protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families.'
 
 
 17
 H.R.Rep. No. 91-563, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Ad.News, p. 2503. (Footnote omitted.)
 
 
 18
 "By 1972, however, the record of the Social Security Agency of the Department of Health, Education and Welfare in processing and disposing of pneumoconiosis claims was anything but satisfactory to Congress. In passing the Black Lung Act of 1972, Congress recorded these findings and purpose:
 
 
 19
 ' § 901. Congressional findings and declaration of purpose
 
 
 20
 Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease or who were totally disabled by this disease at the time of their deaths; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents. It is, therefore, the purpose of this subchapter to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease or who were totally disabled by this disease at the time of their deaths; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.'
 
 
 21
 30 U.S.C. § 901 (Supp.1975).
 
 
 22
 "The Senate Report on the bill was more explicit as to, at least, Congressional intent:
 
 
 23
 'Accordingly, the Committee expects the Secretary to adopt such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments. Such interim rules and criteria shall give full consideration to the combined employment handicap of disease and age and provide for the adjudication of claim on the basis of medical evidence other than breathing tests when it is not feasible or practicable to provide physical performance tests of the type described in the above cited section from the Secretary's annual report. For example, an older miner who has developed pneumoconiosis, or another respiratory or pulmonary disease which is presumed to be pneumoconiosis, and who is no longer working as a miner, would be prevented from returning to or continuing in his usual work as a miner due to the combined employment handicaps of advancing age and respiratory or pulmonary disease, even though the disease may have produced relatively little functional loss.'
 
 
 24
 S.Rep. No. 92-743, 92d Cong. 2d Sess. (1972), U.S.Code Cong. & Ad.News, pp. 2322-23."
 
 
 25
 Begley v. Mathews, 544 F.2d 1345, 1347-48 (6th Cir. 1976). (Emphasis added.)[1]
 
 
 26
 In the Begley case this circuit defined its standard for interpretation of the Black Lung Benefits Act:
 
 
 27
 "We believe remedial legislation such as the Black Lung Benefits Act should be given a liberal interpretation; and moreover Congress clearly stated its desires for the Secretary to do just that in relation to this specific Act."
 
 
 28
 Begley v. Mathews, supra at 1346.
 
 
 29
 With these principles in mind, we turn to the highly technical issues of these
 
 
 30
 appeals. DID THE BENEFITS REVIEW BOARD AND DOES THIS COURT
 
 
 31
 HAVE JURISDICTION TO HEAR THESE TWO APPEALS?
 
 
 32
 Respondents claim that the hearing officers, the Benefits Review Board, and this court are without jurisdiction in these black lung cases. They argue that the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 33 U.S.C. §§ 902-948a (Supp. V, 1975), amending 33 U.S.C. §§ 901 et seq. (1970), which created the Benefits Review Board and the adjudication procedures used in these cases, do not apply to the Black Lung Benefits Act of 1972. The Black Lung Benefits Act of 1972 adopted the adjudication procedures of the Longshoremen's and Harbor Workers' Compensation Act "as amended" but it was enacted a few months before the Longshoremen's Act Amendments were passed.[2]
 
 
 33
 The Benefits Review Board has held that the Longshoremen's Act Amendments do apply to black lung cases and that it did have jurisdiction. Fields v. A.K.P. Coal Co., 3 Benefits Rev.Bd.Serv. 269 (1976), rev'd on other grounds, 4 Benefits Rev.Bd.Serv. ---.
 
 
 34
 In the Fields case, the Benefits Review Board's opinion began by pointing out that the Black Lung Benefits Act adopted the review provisions of the Longshoremen's Act:
 
 
 35
 "Section 422, (30 U.S.C. § 932 (Supp. V, 1975)) of the Act (Black Lung Benefits Act) was initially enacted on December 30, 1969. It was subsequently amended on May 19, 1972. The provision with which we are initially concerned in this case is Section 422(a), which reads as follows:
 
 
 36
 'During any period after December 31, 1973, in which a State workmen's compensation law is not included on the list published by the Secretary under section 421(b) of this part, the provisions of Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927),[3] as amended (other than the provisions contained in sections 1, 2, 3, 4, 8, 9, 10, 12, 13, 29, 30, 31, 33, 37, 38, 41, 43, 44, 45, 46, 47, 48, 49, 50 and 51 thereof) shall (except as otherwise provided in this subsection and except as the Secretary shall by regulation otherwise provide), be applicable to each operator of a coal mine in such State with respect to death or total disability due to pneumoconiosis arising out of employment in such mine. In administering this part, the Secretary is authorized to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator.'
 
 
 37
 This provision incorporates by reference numerous substantive and procedural provisions of the Longshoremen's and Harbor Workers' Compensation Act (hereafter referred to as the Longshoremen's Act) into the Black Lung Benefits Act.
 
 
 38
 "Although Section 422(a) appeared in the Act in 1969, it was amended in 1972. Among the sections of the Longshoremen's Act which were excluded from the Act in 1969 was Section 7, 33 U.S.C. § 907, which provides for the furnishing of medical services and supplies to claimants by employers who are responsible for payment of benefits. By amendment in 1972, this section was removed from the list of excluded provisions, thus placing on a responsible operator the substantial additional burden of providing medical care to those victims of pneumoconiosis to whom he must pay compensation under the Act. This significant change in Section 422(a) has the effect of reenacting the incorporation by reference of Longshoremen's Act provisions which are not on the list of excluded sections. Therefore, the incorporation by reference of sections of the Longshoremen's Act by the Act dates from May 1972 and not from December 1969.
 
 
 39
 "Among the provisions of the Longshoremen's Act which were incorporated by the Act is Section 19, 33 U.S.C. § 919, concerning procedure in respect of claims, including the conduct of formal hearings. In May of 1972, hearings under the Longshoremen's Act were conducted by deputy commissioners, who are not hearing examiners (administrative law judges) qualified under Section 3105 of the Administrative Procedure Act. 5 U.S.C. § 3105. However, at the same session of Congress during which the Act was amended (92d Congress, 2d Session), the Longshoremen's Act was also amended. In amending the Longshoremen's Act, Congress provided that hearings be conducted by qualified hearing examiners (administrative law judges), effective as of the date of enactment of the amendments, October 26, 1972. The question then arises whether this amendment to the Longshoremen's Act affects the conduct of formal hearings under the Act. To answer this question, we look to comparable provisions of other statutes which are included in the Federal workmen's compensation scheme and also incorporate substantial portions of the Longshoremen's Act, including its procedural provisions.
 
 
 40
 "The statutes which are comparable to the Act, and are commonly recognized as extensions of the Longshoremen's Act, are the Defense Base Act, 42 U.S.C. §§ 1651 et seq., the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq., and the Nonappropriated Fund Instrumentalities Act, 5 U.S.C. §§ 8171 et seq. The provisions of these statutes which incorporate provisions of the Longshoremen's Act by reference are as follows:
 
 
 41
 'Except as herein modified, the provisions of the Longshoremen's and Harbor Workers' Compensation Act, as amended, shall apply in respect to the injury or death of any employee engaged in any employment . . . . (Defense Base Act)
 
 
 42
 With respect to disability or death of an employee resulting from any injury occurring as the result of operations described in subsection (b) of this section, compensation shall be payable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act . . . . (Outer Continental Shelf Lands Act)
 
 
 43
 The Longshoremen's and Harbor Workers' Compensation Act shall apply with respect to the disability or death resulting from injury, as defined in section 2(2) of such Act, occurring to a civilian employee of any nonappropriated fund instrumentality described in section 1 of this Act, subject to the following provisions of this section: . . . . (Nonappropriated Fund Instrumentalities Act)'
 
 
 44
 "These incorporating provisions are similar to that of Section 422(a) of the Act. Although the quoted provisions do not specifically provide that amendments to the Longshoremen's Act also apply to the other statutes, such amendments have uniformly been construed to be applicable in both substantive and procedural matters. It is only reasonable to conclude, therefore, that the Longshoremen's Act amendments also apply to the Act. It would be incongruous to hold that significant amendments to the Longshoremen's Act, having substantial impact on both adjudication procedures and benefits, do not apply to the Act, particularly where both enactments were adopted at the same session of Congress under sponsorship of the same Congressional Committees and where the Longshoremen's Act amendments became effective at least eight months before any proceedings under the Act to which the Longshoremen's Act is applicable could be instituted. Considering the present issue before the Board, the amendment to Section 19(d) of the Longshoremen's Act must logically apply to proceedings held under the Act."
 
 
 45
 Fields v. A.K.P. Coal Co., supra at 274-77. (Emphasis added.)Although the Benefits Review Board and the Department of Labor have taken this position consistently, we do not find this issue a simple one. It is clear that Congress in adopting the review sections of the Longshoremen's Act as a part of the Black Lung Benefits Act[4] did so five months before it adopted the Longshoremen's Act Amendments of 1972.[5] These amendments created the Benefits Review Board and provided for direct review of the Benefits Review Board's decisions by this court. Such a sequence of events would not generally mean that the later amendments applied to the earlier ones, absent clear indication of Congressional intent to have them do so.
 
 
 46
 Respondent's brief in this regard relies upon the following statement of the general rule:
 
 
 47
 "A statute of specific reference incorporates the provisions referred to from the statute as of the time of adoption without subsequent amendments, unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments with the statute.
 
 
 48
 2A Sutherland on Statutory Construction § 51.08 (4th ed. C. Sands 1973). (Footnotes omitted.)"
 
 
 49
 See Hasset v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1937).
 
 
 50
 Accepting the above as an authoritative statement of the applicable rule, we believe this record does disclose by the strongest implication Congressional intent to make the later adopted 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, supra, applicable to the Black Lung Benefits Act of 1972. We also believe that Congress' intent in this regard is indicated in sufficient ways and in clear enough statement to satisfy the "express intent" standard.
 
 
 51
 The two bills were under consideration in both houses at the same time. Both Acts became effective in the same session of the Congress and in the same year. The effective dates of the two Acts were only five months apart. Congress may not have known in advance which Act would actually be adopted first.
 
 
 52
 Of significance also is the fact that the portion of the black lung program with which we deal here did not become effective until July 1, 1973 eight months after the effective date of the Longshoremen's Act Amendments of 1972.
 
 
 53
 Of greater significance, however, is the fact that beyond dispute Congress regarded the new adjudicatory provisions of the Longshoremen's Act Amendments of 1972 as replacement for outmoded and unsatisfactory past methods of review (writs of mandamus in the United States District Courts and subsequent appeals to the United States Courts of Appeals).[6] In addition, Congress clearly intended to employ the new adjudicatory provisions of the Longshoremen's Act Amendments of 1972 as the method of review of a considerable number of workmen's compensation acts other than the Black Lung Benefits Act. We thus deal here with one of a number of enactments which are in pari materia and, hence, should, if there is doubt as to proper construction, be construed together.
 
 
 54
 The earliest statement of this doctrine in the United States is found in an opinion of Chief Justice John Marshall which says succinctly:"Without deciding this question, as depending merely on the original law, it is to be observed, that acts in pari materia are to be construed together as forming one act. If, in a subsequent clause of the same act, provisions are introduced, which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law."
 
 
 55
 Alexander v. Alexandria, 9 U.S. (5 Cranch) *1, *7-8, 3 L.Ed. 19 (1809).
 
 
 56
 The same principles have much more recently been discussed by Justice Thurgood Marshall:
 
 
 57
 "The rule of in pari materia like any canon of statutory construction is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a "later act can . . . be regarded as a legislative interpretation of (an) earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting," and "is therefore entitled to great weight in resolving any ambiguities and doubts." United States v. Stewart, (311 U.S. 60 (1940)), at 64-65, (61 S.Ct. 102, at 105, 85 L.Ed. 40). See also e. g. Hunter v. Erickson, 393 U.S. 385, 388, (89 S.Ct. 557, 559, 21 L.Ed.2d 616) (1969); United States v. Freeman, (44 U.S. (3 How.) 556 (1845)), at 565, (11 L.Ed. 724). The rule is but a logical extension of the principle that individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject, cf. Allen v. Grand Central Aircraft Co., 347 U.S. 535, 541-552, (74 S.Ct. 745, 748-755, 98 L.Ed. 933) (1954). Given this underlying assumption, the rule's application certainly makes the most sense when the statutes were enacted by the same legislative body at the same time."
 
 
 58
 Erlenbaugh v. United States, 409 U.S. 239, 243-44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). (Footnotes omitted.)
 
 
 59
 Here the relevant statutes were all adopted by the Congress of the United States and all deal with the same general subject the provision of workmen's compensation in employment areas where Congress has assumed particular concern and responsibility.
 
 
 60
 The statutes we deem relevant to our present problem include: 1) The Longshoremen's & Harbor Worker's Compensation Act Amendments of 1972, supra; 2) The Black Lung Benefits Act of 1972, supra; 3) The Defense Base Act, 42 U.S.C. §§ 1651-54 (1970); 4) The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(c) (1970); and 5) The Non-Appropriated Fund Instrumentalities Act, 5 U.S.C. §§ 8171-73 (1970).
 
 
 61
 What we deduce from these statutes is that Congress has decided to employ the Longshoremen's Act as the basic procedural vehicle for workmen's compensation claims. In the debate concerning adoption of the Longshoremen's Act Amendments of 1972, Congressman Steiger inserted the following question and answer in the Congressional Record:
 
 DISTRICT OF COLUMBIA EMPLOYEE COVERAGE
 
 62
 Q. What is the impact of this bill on the District of Columbia?
 
 
 63
 A. District of Columbia employees have been covered under the Longshoremen's and Harbor Worker's Compensation Act since 1928. At the time this was done as a matter of convenience, but the Longshoremen's Act has become a sort of catch-all for Federal compensation coverage for other special areas. For example, the bill also covers compensation in overseas defense facilities and off-shore oil drilling rigs on the Continental Shelf.
 
 
 64
 118 Cong.Rec. 36386 (1972). (Emphasis added.)In this same connection, Senator Williams noted:
 
 
 65
 The present Longshoremen Act, passed by Congress in 1927, generally provides a Federal compensation program for injuries or death arising from employment on the navigable waters of the United States. Because this legislation was the only Federal control over private employment in workmen compensation matters (sic ).
 
 
 66
 The statute over the years has been extended to cover employees of the District of Columbia and other areas of Federal interest.
 
 
 67
 More than 200,000 longshoremen and ship repairmen are covered by the statute. In addition another 300,000 employees of private employers within the District of Columbia are protected by the law as well as an additional 200,000 workers in defense bases, in nonappropriated fund agencies such as post exchanges, and in work on the Outer Continental Shelf.
 
 
 68
 118 Cong.Rec. 36270 (1972).
 
 
 69
 After adoption of the amendments, Senator Eagleton commented:
 
 
 70
 The bill . . . provides for important administrative changes respecting both the worker's rights and the operations of the Department of Labor in administering this system of compensation for the over 800,000 employees who depend upon its protection.
 
 
 71
 118 Cong.Rec. 37283 (1972).
 
 
 72
 While the Congressmen did not make specific reference to the Black Lung Benefits Act the intention to construct a scheme of workmen's compensation acts with hearing and review procedures and benefits, all to be established within the framework of the Longshoremen's Act, appears unmistakable.
 
 
 73
 Of significance, likewise, is the fact that the Black Lung legislation had never had any separate provisions for judicial review but had from the passage of this legislation in 1969 contained provisions incorporating the adjudicatory measures of the Longshoremen's Act. If the words "as amended" in the 1972 Black Lung Benefits Act Amendments are not construed as incorporating the review mechanism of the Longshoremen's Act Amendments of 1972, then, contrary to expressed Congressional intent, decisions on black lung claims would initially be made by Deputy Commissioners who are direct administrative officers of the Department of Labor, and review would have to follow the route of District Court mandamus proceedings and subsequent review by the United States Courts of Appeals. The review standards provided by petitions for writs of mandamus are utterly inconsistent with the Congressional intentions which we have quoted at the beginning of this opinion pertaining to the Black Lung Act Amendments of 1972.
 
 
 74
 The Third, Seventh and Fourth Circuits have upheld the Benefits Review Board's view of this issue in similar cases. Krolick Contracting Co. v. Benefits Review Board, 558 F.2d 685, 688 (3d Cir. 1977); Director v. Peabody Coal Co., 554 F.2d 310, 317-331 (7th Cir. 1977); Director v. National Mines Corp., 554 F.2d 1267, 1271-1273 (4th Cir. 1977). See Appalachian Power Co. v. Dunlop, 399 F.Supp. 972 (S.D.W.Va.1975), which assumed that the 1972 Longshoremen's Act Amendments of 1972 did apply to black lung cases.
 
 
 75
 Support for the Benefits Review Board's position may also be found in Circuits which have interpreted similar laws. Several other federal worker compensation statutes adopt by reference portions of the Longshoremen's and Harbor Workers' Compensation Act employing language similar to that found in the Black Lung Benefits Act of 1972. Defense Base Act, 42 U.S.C. §§ 1651-54 (1970); Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(c) (1970); Non-Appropriated Fund Instrumentalities Act, 5 U.S.C. §§ 8171-73 (1970).[7] Two Circuits have entertained petitions for review of awards under those statutes which have been processed under the new procedures. Presley v. Tinsley Maintenance Service, 529 F.2d 433 (5th Cir. 1976), and Offshore Food Service, Inc. v. Benefits Review Board, 524 F.2d 967 (5th Cir. 1975) (Outer Continental Shelf Lands Act cases); Landrum v. Director, 534 F.2d 67 (5th Cir. 1976), and Overseas African Construction Corp. v. McMullen, 500 F.2d 1291 (2d Cir. 1974) (Defense Base Act cases).
 
 
 76
 Like the Benefits Review Board and the Third, Fourth, and Seventh Circuits, we hold that the Benefits Review Board and this Court do have jurisdiction over these cases.
 
 STANDING
 
 77
 Respondent coal companies contend that the Director of the Office of Workers' Compensation Programs has no standing to prosecute these appeals. Our consideration of this issue begins with Rule 15(a) and (b) of the Federal Rules of Appellate Procedure (particularly those sentences italicized which require the agency to be a party and give general authority to the "agency" or "designated officer" to act as a party in the Courts of Appeals).
 
 
 78
 Rule 15.
 
 
 79
 Review or Enforcement of Agency Orders How Obtained; Intervention
 
 
 80
 (a) Petition for Review of Order; Joint Petition. Review of an order of an administrative agency, board, commission or officer (hereinafter, the term "agency" shall include agency, board, commission or officer) shall be obtained by filing with the clerk of a court of appeals which is authorized to review such order, within the time prescribed by law, a petition to enjoin, set aside, suspend, modify or otherwise review, or a notice of appeal, whichever form is indicated by the applicable statute (hereinafter, the term "petition for review" shall include a petition to enjoin, set aside, suspend, modify or otherwise review, or a notice of appeal). The petition shall specify the parties seeking review and shall designate the respondent and the order or part thereof to be reviewed. Form 3 in the Appendix of Forms is a suggested form of a petition for review. In each case the agency shall be named respondent. The United States shall also be deemed a respondent if so required by statute, even though not so designated in the petition. If two or more persons are entitled to petition the same court for review of the same order and their interests are such as to make joinder practicable, they may file a joint petition for review and may thereafter proceed as a single petitioner.
 
 
 81
 (b) Application for Enforcement of Order; Answer; Default; Cross-Application for Enforcement. An application for enforcement of an order of an agency shall be filed with the clerk of a court of appeals which is authorized to enforce the order. The application shall contain a concise statement of the proceedings in which the order was entered, the facts upon which venue is based, and the relief prayed. Within 20 days after the application is filed, the respondent shall serve on the petitioner and file with the clerk an answer to the application. If the respondent fails to file an answer within such time, judgment will be awarded for the relief prayed. If a petition is filed for review of an order which the court has jurisdiction to enforce, the respondent may file a cross-application for enforcement.
 
 
 82
 Fed.R.App.P. 15(a), (b). (Emphasis added.)
 
 
 83
 We recognize that this rule does not precisely anticipate the form of this appeal. It does, however, for purposes of this litigation clearly define an "officer" as a proper party to litigate. It requires the presence of the agency (or "officer" thereof) as respondent or as cross-petitioner. And it contemplates review in the Court of Appeals.
 
 
 84
 Additionally, we consider relevant the following Congressional grants of authority for the Secretary:
 
 
 85
 1) To administer the provisions of this chapter and to make "rules and regulations."
 
 
 86
 § 939. Administration.
 
 
 87
 (a) Except as otherwise specifically provided, the Secretary shall administer the provisions of this chapter (the Longshoremen's and Harbor Workers' Compensation Act, supra ), and for such purpose the Secretary is authorized (1) to make such rules and regulations; . . . .
 
 
 88
 33 U.S.C. § 939(a) (1970). See also 5 U.S.C. § 301 (1970) (quoted infra ).
 
 
 89
 2) To appear before the Courts of Appeals through attorneys appointed by him.
 
 
 90
 § 921a. Appearance of attorneys for Secretary, deputy commissioner, or Board.
 
 
 91
 Attorneys appointed by the Secretary shall represent the Secretary, the deputy commissioner, or the Board in any court proceedings under section 921 of this title or other provisions of this chapter except for proceedings in the Supreme Court of the United States.
 
 
 92
 33 U.S.C. § 921a (Supp. V, 1975).
 
 
 93
 3) To assist claimants and provide them legal assistance.
 
 
 94
 § 939. Administration.
 
 
 95
 (c)(1) The Secretary shall, upon request, provide persons covered by this chapter with information and assistance relating to the chapter's coverage and compensation and the procedures for obtaining such compensation and including assistance in processing a claim. The Secretary may, upon request, provide persons covered by this chapter with legal assistance in processing a claim. The Secretary shall also provide employees receiving compensation information on medical, manpower, and vocational rehabilitation services and assist such employees in obtaining the best such services available.
 
 
 96
 33 U.S.C. § 939(c)(1) (Supp. V, 1975).
 
 
 97
 4) To delegate his authority in carrying out these purposes.
 
 
 98
 § 301. Departmental regulations. The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property.
 
 
 99
 5 U.S.C. § 301 (1970), formerly Rev.Stat. § 161 (2d ed. 1878).
 
 
 100
 See 33 U.S.C. § 939(a) (1970); Cudahy Packing Co. v. Holland, 315 U.S. 357, 366, 62 S.Ct. 651, 86 L.Ed. 895 (1942); cf. Fleming v. Mohawk Co., 331 U.S. 111, 121, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). See also 30 U.S.C. § 954 (1970):
 
 
 101
 § 954. Appointment of administrative personnel and inspectors; qualifications; training programs.
 
 
 102
 The Secretary may, subject to the civil service laws, appoint such employees as he deems requisite for the administration of this chapter and prescribe their duties.
 
 
 103
 Another statutory provision imposes secondary liability upon the Secretary of Labor (or his duly designated representative) to pay benefits found to be due if there is no responsible employer or the responsible coal company fails to pay benefits within a reasonable period of time or does not have insurance:
 
 
 104
 § 934. Failure of operators to secure benefits; duties of United States; indemnification.
 
 
 105
 If a totally disabled miner or a widow, child, parent, brother, or sister is entitled to benefits under section 932 of this title and (1) an operator liable for such benefits has not obtained a policy or contract of insurance, or qualified as a self-insurer, as required by section 933 of this title, or such operator has not paid such benefits within a reasonable time, or (2) there is no operator who was required to secure the payment of such benefits, the Secretary shall pay such miner or such widow, child, parent, brother, or sister the benefits to which he or she is so entitled. In a case referred to in clause (1), the operator shall be liable to the United States in a civil action in an amount equal to the amount paid to such miner or his widow, child, parent, brother, or sister under this subchapter.
 
 
 106
 30 U.S.C. § 934 (Supp. V, 1975).
 
 
 107
 Another statutory provision we deem relevant states that a final order of the Benefits Review Board may be reviewed by the appropriate Court of Appeals on petition of "any person adversely affected or aggrieved":
 
 
 108
 § 921. Review of compensation orders.
 
 
 109
 (c) Court of appeals; jurisdiction; persons entitled to review; petition; record; determination and enforcement; service of process; stay of payments.
 
 
 110
 Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court, to the Board, and to the other parties, and thereupon the Board shall file in the court the record in the proceedings as provided in section 2112 of Title 28. Upon such filing, the court shall have jurisdiction of the proceeding and shall have the power to give a decree affirming, modifying, or setting aside, in whole or in part, the order of the Board and enforcing same to the extent that such order is affirmed or modified. The orders, writs, and processes of the court in such proceedings may run, be served, and be returnable anywhere in the United States. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless ordered by the court. No stay shall be issued unless irreparable injury would otherwise ensue to the employer or carrier. The order of the court allowing any stay shall contain a specific finding, based upon evidence submitted to the court and identified by reference thereto, that irreparable damage would result to the employer, and specifying the nature of the damage.
 
 
 111
 33 U.S.C. § 921 (Supp. V, 1975).
 
 
 112
 Also relevant to Congressional intent with respect to the standing of the Secretary, or his delegated representative, to litigate (although not relevant to this proceeding) is 33 U.S.C. § 921(d) (Supp. V, 1975):
 
 
 113
 § 921. Review of compensation orders.
 
 
 114
 (d) District court; jurisdiction; enforcement of orders; application of beneficiaries of awards or deputy commissioner; process for compliance with orders.
 
 
 115
 If any employer or his officers or agents fails to comply with a compensation order making an award, that has become final, any beneficiary of such award or the deputy commissioner making the order, may apply for the enforcement of the order to the Federal district court for the judicial district in which the injury occurred (or to the United States District Court for the District of Columbia if the injury occurred in the District). If the court determines that the order was made and served in accordance with law, and that such employer or his officers or agents have failed to comply therewith, the court shall enforce obedience to the order by writ of injunction or by other proper process, mandatory or otherwise, to enjoin upon such person and his officers and agents compliance with the order.
 
 
 116
 It thus appears that Congress has given the Labor Department the responsibility for enforcement of the Black Lung Benefits Act (incorporating the adjudicatory provisions of the Longshoremen's Act) in at least three different respects which are relevant to this appeal. First, the Department is charged with administration of the Acts and the Secretary is charged with promulgating regulations implementing these Acts. Second, the Department has responsibility for defending the federal fisc by defending against invalid claims and, where appropriate, by seeing to it that coal companies bear their proper burden for valid claims. Third, the Department also clearly has responsibility for assisting miner claimants in both Department hearings and the courts. The legislative history explains this last provision:
 
 ASSISTANCE TO CLAIMANTS
 
 117
 Section 39 of the Act (33 U.S.C. § 939) is amended to substantially increase the Secretary's responsibility for administering this program so far as providing services to employees. The bill will require the Secretary upon request to provide assistance to persons covered under this act to understand the benefits and other matters relating to the operations of the statute and also to provide assistance in processing a claim. It is intended that this assistance be all inclusive and enable the employee to receive the maximum benefits due to him without having to rely on outside assistance other than that provided by the Secretary. The bill also makes legal assistance in processing the claim for benefits under this Act available in needy cases upon request subject to the Secretary's discretion. It is the committee's desire that the Secretary construe this provision as liberally as possible so as to provide any worker in need of legal assistance such counsel, especially where the employee is either indigent or of minimal means. It would also be appropriate for the Secretary to provide legal assistance in similar types of death cases as well as to provide as much assistance in other cases of hardship or unusual types of proceedings or difficult cases.
 
 
 118
 H.Rep. No. 92-1441, 92d Cong., 2d Sess., reprinted in (1972) U.S.Code Cong. & Ad.News 4698, 4710.
 
 SECTION 17
 
 119
 This section amends section 39(c) to require the Secretary, upon request, to provide assistance to persons covered by the Act to aid them in understanding the Act's provisions and to assist them in processing a claim. The Secretary may, upon request, where circumstances warrant provide individuals with legal assistance in processing a claim under the Act. The Secretary would also be required to provide information on medical, manpower, and vocational rehabilitation services to employees receiving compensation under the Act and to assist them in obtaining such services.
 
 Id. at 4719. (Emphasis added.)
 
 120
 The Secretary of Labor responded to these various statutory provisions by regulations, one of which designated the Director of the Office of Workers' Compensation Programs to administer the benefits programs under the Black Lung Benefits Act:
 
 OFFICE OF WORKMEN'S COMPENSATION PROGRAMS
 
 121
 § 701.201 Establishment of Office of Workmen's Compensation Programs.
 
 
 122
 The Assistant Secretary of Labor for Employment Standards, by authority vested in him by the Secretary of Labor in Secretary's Order No. 13-71, 36 FR 8755, has established in the Employment Standards Administration (ESA) an Office of Workmen's Compensation Programs (OWCP). The Assistant Secretary has further designated as the head thereof a Director who, under the general supervision of the Deputy Assistant Secretary for Employment Standards/Wage-Hour Administrator and the Deputy Administrator, shall administer the programs assigned to that office by the Assistant Secretary.
 
 
 123
 § 701.202 Transfer of functions.
 
 
 124
 Pursuant to the authority vested in him by the Secretary of Labor, the Assistant Secretary for Employment Standards has transferred from the Bureau of Employees' Compensation to the Office of Workmen's Compensation Programs all functions of the Department of Labor with respect to the administration of benefits programs under the following statutes:(a) The Longshoremen's and Harbor Workers' Compensation Act, as amended and extended, 33 U.S.C. 901 et seq.;
 
 
 125
 (b) Defense Base Act, 42 U.S.C. 1651 et seq.;
 
 
 126
 (c) District of Columbia Workmen's Compensation Act, 36 D.C.Code 501 et seq.;
 
 
 127
 (d) Outer Continental Shelf Lands Act, 43 U.S.C. 1331;
 
 
 128
 (e) Nonappropriated Fund Instrumentalities Act, 5 U.S.C. 8171 et seq.;
 
 
 129
 (f) Title IV of the Federal Coal Mine Health and Safety Act, 83 Stat. 742, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150.
 
 
 130
 20 C.F.R. §§ 701.201, 701.202 (1976). (Emphasis added.)
 
 
 131
 As the designee of the Secretary of Labor, the Director of Workmen's Compensation Programs is "a party in interest in any proceeding in which his obligation to pay benefits under § 424 (30 U.S.C. § 934 (Supp. V, 1975)) of the Act or to take other action under provisions of the Act may depend on the resolution of an issue or issues to be determined or adjudicated in that proceeding." 20 C.F.R. § 725.411(b) (1976).
 
 
 132
 Finally, we take cognizance of the following provision of the Judicial Code:
 
 
 133
 § 2348. Representation in proceeding; intervention
 
 
 134
 The Attorney General is responsible for and has control of the interests of the Government in all court proceedings under this chapter. The agency, and any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and as of right, and be represented by counsel in any proceeding to review the order. Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order. The Attorney General may not dispose of or discontinue the proceeding to review over the objection of any party or intervenor, but any intervenor may prosecute, defend, or continue the proceeding unaffected by the action or inaction of the Attorney General.
 
 
 135
 28 U.S.C. § 2348 (1970). (Emphasis added.)
 
 
 136
 While this section is not applicable to Black Lung Benefits cases because Congress has provided specific review procedures, the section just quoted demonstrates a Congressional policy of granting an agency "whose interest will be affected" the power to "appear as (a) part(y) . . . as of right." In this case the Solicitor of Labor appears before this court on behalf of the Director.
 
 
 137
 Under these circumstances, we have no doubt that the Director has standing to appear in this court to prosecute these appeals on behalf of the Department of Labor.
 
 
 138
 Assuming, as we do, that adversity is required, we believe that it is amply supplied by the genuineness of the dispute among the Director and the Benefits Review Board and the respondents over the legal questions tendered in this appeal, as well as the ultimate dispute between the Director and the coal companies as to whether the Department or the companies must pay benefits. We believe that the Director is also a "person adversely affected or aggrieved" (see 33 U.S.C. § 921(c) (Supp. V, 1975); see also 5 U.S.C. § 702 (1970), as amended, 5 U.S.C.A. § 702 (1977)) in that in this litigation he is seeking what he deems to be lawful administration of the Act and assisting claimants Large and Graham, whose awards of benefits have been vacated by the Benefits Review Board, as well as defending the regulations he is charged with administering.
 
 
 139
 It would be strange, indeed, if the designated representative of a department of the United States Government authorized by Congress to disburse millions of dollars in benefits to citizens could not appear as a party to represent the government in important litigation concerning administration of the Act authorizing the disbursement. Contrary to the view taken by the Third Circuit upon which respondents rely, the Director in this litigation is no private party required to show "that he has suffered injury in fact." See Director v. Rochester & Pittsburgh Coal Co., (3d Cir. 1977) (decided Jan. 17, 1977, slip op. at 4).[8] The question in this case is whether or not the interest of the Department of Labor of the United States Government has been adversely affected or aggrieved. The Director appears here not as a private individual in any sense, but as the authorized representative of the Department of Labor.
 
 
 140
 Recognizing these facts, it appears to us that United States ex rel. Chapman v. Federal Power Commission, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953), is much closer in point than the cases relied upon by the Third Circuit, both of which dealt with the standing of private parties rather than government departments or officers. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In Chapman the Fourth Circuit had determined that the Secretary of the Interior was not "a person . . . aggrieved" by an order of the Federal Power Commission granting the rights to a private party to construct a hydroelectric dam. The Fourth Circuit held that the Secretary of the Interior had no standing. Justice Frankfurter, writing for the majority of the Court, responded as follows:
 
 
 141
 "In these two cases, the Secretary of the Interior and an association of nonprofit rural electric cooperatives have challenged the authority of the Federal Power Commission to grant to the respondent power company, VEPCO, a license to construct a hydroelectric generating station at Roanoke Rapids, North Carolina. They claim that Congress, by approving a comprehensive plan set out in the Flood Control Act of 1944 for improvement of the Roanoke River Basin, has withdrawn all eleven sites proposed for development in the plan, including Roanoke Rapids, from the licensing jurisdiction of the Commission and has reserved them for public construction. The underlying premise, that the plan approved by Congress presupposed federal development of all sites included in the plan, also underlies petitioners' other main contention here, that the Commission's concurrence in the plan constituted a determination by the Commission that the development of these water resources should be undertaken by the United States itself. Such a determination, they say, requires the Commission under § 7(b) of the Federal Power Act, 41 Stat. 1067, as amended, 49 Stat. 842, 16 U.S.C. § 800(b), to make investigations and submit its findings together with appropriate recommendations to Congress and in any event bars the Commission from approving applications for private construction of the project. Petitioners unsuccessfully raised these contentions, along with attacks on the Commission's findings not pressed here, before the Court of Appeals for the Fourth Circuit, which denied their petitions to set aside the Commission's order granting a license to VEPCO. United States v. Federal Power Comm'n, 191 F.2d 796. We granted certiorari, 343 U.S. 941, 72 S.Ct. 1034, 96 L.Ed. 1346. The cases present questions of importance in that they involve a conflict of view between two agencies of the Government having duties in relation to the development of national water resources. Determination of the issues may affect a substantial number of important potential sites for the development of hydroelectric power. Cf. Rules Sup.Ct. 38(5)(b).
 
 
 142
 "Both here and in the court below, petitioners' standing to raise these issues has been questioned. The Secretary of the Interior points to his statutory duty to act as sole marketing agent of power developed at public hydroelectric projects and not required for the operation of the project; § 5 of the Flood Control Act of 1944 directs him to transmit and dispose of such power in a manner calculated to 'encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles.' 58 Stat. 890, 16 U.S.C. § 825s. This provision, it is said, announces a congressional policy for the guidance of the Secretary that would be disturbed by the respondent company's plan; thus a specific interest of the Secretary, in addition to his more general duties relating to the conservation and utilization of the Nation's water resources, is said to be adversely affected by the Commission's order. The REA Association, an association of cooperatives, asserts that, as an organization of consumers entitled, along with 'public bodies,' to a preference in sales by the Secretary under § 5, it has a substantial interest in the development of low-cost power at the Roanoke Rapids site and consequently in the kind of instrumentality, public or private, to which power development at this site is committed. Respondents say, however, that decisions of policy in the construction of power projects have been entrusted to the Commission, or at most also to the Secretary of the Army, under whom the Corps of Engineers performs its statutory functions of making surveys and constructing public works, and that the interests of petitioners arise only after a public project has been constructed and the Secretary of the Army has determined that there is excess power to be distributed and sold.
 
 
 143
 "We hold that petitioners have standing. Differences of view, however, preclude a single opinion of the Court as to both petitioners. It would not further clarification of this complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations, to set out the divergent grounds in support of standing in these cases."
 
 
 144
 United States ex rel. Chapman v. Federal Power Commission, supra at 154-56, 73 S.Ct. at 611-612.
 
 
 145
 The Justices who dissented in the Chapman case went directly to the merits without discussion of the standing question, obviously agreeing that the Secretary of the Interior had standing to bring the action. While the facts of this case are remote from those of our instant litigation, the case does plainly stand for the proposition that a department of government may have judicial standing to challenge the decision of another department concerning the proper interpretation of legislative enactments under which both departments have been given responsibilities.
 
 
 146
 The standing of the Director of Workers' Compensation Programs to litigate in relation to Department of Labor Compensation Programs has been repeatedly recognized by the courts in recent years. Since the adoption of 20 C.F.R. §§ 701.201 and 701.202, the Director has appeared and been recognized by the United States courts involved in at least 35 cases.[9]
 
 
 147
 The standing issue has been dealt with in seven cases in the Courts of Appeals. Four of these cases have directly upheld the Director's standing as a party before the Courts of Appeals. Krolick Contracting Co. v. Benefits Review Board, 558 F.2d 685, 689 (3d Cir. 1977), cert. denied sub nom. Maritime Terminals v. Brown, --- U.S. at ----, 97 S.Ct. 2972; Director v. Peabody Coal Co., 554 F.2d 310, 332-38 (7th Cir. 1977); Director v. National Mines Corp., 554 F.2d 1267, 1271-72 (4th Cir. 1977); Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, 546 (5th Cir. 1976), accord with footnote 9 at ----. In McCord v. Benefits Review Board, 168 U.S.App.D.C. 302, 514 F.2d 198 (1975), the court granted the Board's motion to be dismissed as a party respondent. The Director's status as petitioner in a companion case was unchallenged. See id. at 199 n.1; McCord v. Cephas, 174 U.S.App.D.C. 302, 532 F.2d 1337 (1976).
 
 
 148
 In I. T. O. Corp. v. Benefits Review Board, 542 F.2d 903 (4th Cir. 1976), vacated on other grounds sub nom. Adkins v. I. T. O. Corp., --- U.S. ----, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), the majority of the en banc court for the Fourth Circuit held that "The Director is not automatically a respondent in a review proceeding under § 921(c)." Id. at 909. Having so decided, however, the majority then invited the Director to seek to intervene:
 
 
 149
 The Director unquestionably has a right to seek to intervene under Rule 24(b) Fed.R.Civ.P., and an application will ordinarily be granted. See 3B J. Moore, Federal Practice P 24.10(5); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1912. The Director has not, however, sought intervention in these cases. We assume that he has not done so because he does not wish to render moot his assertion that such a request on his part is unnecessary. Having decided that such a request is necessary, we will still consider such a request on his part should he be advised to make it.
 
 Id. at 909. (Footnote omitted.)
 
 150
 It appears that the Fourth Circuit was deciding whether the Director should automatically be substituted for the Benefits Review Board when a party which had lost before that body sought Courts of Appeals review. Our case is distinguishable in that the Benefits Review Board has not sought to appear and the Director is the sole representative of the Department of Labor before this court and has initiated the appeal. We believe that it is the responsibility of the Secretary of Labor to determine the proper representative of his department before this court and that, as outlined above, he has done so. (A panel of the Fourth Circuit has just issued an opinion holding that the Director does have standing to bring an action to review a decision of the Benefits Review Board in a black lung benefits case. Director v. National Mines Corp., supra, at 1271-72.)Finally, we respectfully disagree with the per curiam opinion (discussed above) recently issued by a panel of the Third Circuit in Director v. Rochester & Pittsburgh Coal Co. (3d Cir. Jan. 17, 1977). (This per curiam opinion has been overruled by another panel of the Third Circuit, characterized it as inconsistent with that Court's prior published opinions. Krolick Contracting Co. v. Benefits Review Board, supra, at 689.)[10] For the reasons outlined above, we hold that there is ample adversity present in our instant litigation to make the Director "an adverse party litigant."
 
 
 151
 Since the Benefits Review Board has not appeared or sought to appear in our present case, we find no need to decide more than that it is not a necessary party. See generally I.T.O. Corp. v. Benefits Review Board, 542 F.2d 903 (4th Cir. 1976) (en banc), vacated on other grounds sub. nom. Adkins v. I.T.O. Corp., --- U.S. ----, 97 S.Ct. 2967, 53 L.Ed.2d 1088 (1977), cert. denied sub. nom. Maritime Terminals v. Brown, --- U.S. ----, 97 S.Ct. 2972, 53 L.Ed.2d 1092. Nacirema Operating Co. v. Benefits Review Board, 538 F.2d 73 (3d Cir. 1976); Offshore Food Service, Inc. v. Benefits Review Board, 524 F.2d 967 (5th Cir. 1975); McCord v. Benefits Review Board, 168 U.S.App.D.C. 302, 514 F.2d 198 (1975). Contra Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 42-43 n.5 (2d Cir. 1976) (dicta). The Congressional scheme in the Longshoremen's and Harbor Workers' Act Amendments of 1972 appears to us to have intended the substitution of an agency review board for the preceding review of the United States District Courts. Technically, the Benefits Review Board is a part of the Department of Labor, but actually it is independent of it as far as policy and decision making are concerned. We do not find in the Act any Congressional intention to allow the Secretary of Labor to dictate Benefits Review Board decisions or any intention to compel the Secretary or his duly designated representative to accept them without recourse to the courts when he conscientiously disagrees. Just as a District Court is not a necessary party in this court for review of its decision, we hold the Benefits Review Board is
 
 
 152
 likewise not a necessary party to this litigation. WERE THE
 
 
 153
 HEARINGS IN THESE CASES BEFORE HEARING OFFICERS WHO WERE NOT
 
 
 154
 ADMINISTRATIVE LAW JUDGES UNDER 5 U.S.C. § 3105 PROPERLY
 
 
 155
 AUTHORIZED BY LAW AND REGULATION?
 
 
 156
 Since in Part I of this opinion we have held that the review procedures of the Longshoremen's Act as amended in 1972 were made applicable to the Black Lung Act by Congress, we begin our consideration of the third question in this case by quoting the provision of the Longshoremen's Act Amendments of 1972 which squarely provided for hearings before Administrative Law Judges.
 
 
 157
 In 33 U.S.C. § 919(d) (Supp. V, 1975), Congress provides:
 
 
 158
 § 919. Procedure in respect of claims.
 
 
 159
 (d) Notwithstanding any other provisions of this chapter, any hearing held under this chapter shall be conducted in accordance with the provisions of section 554 of Title 5. Any such hearing shall be conducted by a hearing examiner qualified under section 3105 of that Title. All powers, duties, and responsibilities vested by this chapter, on October 27, 1972, in the deputy commissioners with respect to such hearings shall be vested in such hearing examiners.
 
 In turn, 5 U.S.C. § 3105 (1970) provides:
 
 160
 § 3105. Appointment of hearing examiners.
 
 
 161
 Each agency shall appoint as many hearings examiners as are necessary for proceedings required to be conducted in accordance with sections 556 and 557 of this title. Hearing examiners shall be assigned to cases in rotation so far as practicable, and may not perform duties inconsistent with their duties and responsibilities as hearing examiners.
 
 
 162
 The original intent of Congress to have Black Lung Act cases heard and adjudicated before Administrative Law Judges is clear. Subsequent history also clearly indicates that the Congressional intent in this regard was frustrated and that Congress specifically and repeatedly authorized the deviation from the Administrative Law Judge requirement which the Secretary authorized by regulation.
 
 
 163
 After passage of the Longshoremen's Act Amendments of 1972 (which included 33 U.S.C. § 919(d) (Supp. V, 1975)), the Secretary of Labor sought to implement the statute by asking the Civil Service Commission to supply the needed Administrative Law Judges. The Civil Service Commission responded by asserting that Congress had failed properly to incorporate the Longshoremen's Act Amendments of 1972 into the Black Lung Act of 1972 because the latter was adopted before the former. This, of course, is the identical argument which we have dealt with and rejected in Part I of this opinion.
 
 
 164
 Faced by the probability of years of delay while this legal dispute wended its way through administrative channels to the Benefits Review Board and thence to the Courts of Appeals and the Supreme Court, the Congress enacted amendments to appropriation acts in a series of years. These enactments expressly authorized the Secretary to employ qualified hearing officers who were not Administrative Law Judges chosen under 5 U.S.C. § 3105 (1970). Typical of these amendments is the language of the Department of Health, Education and Welfare Appropriation Act, 1974, Pub.L. No. 93-192, 93d Cong., 1st Sess., 87 Stat. 746, 758 (1973):
 
 SPECIAL BENEFITS FOR DISABLED COAL MINERS
 
 165
 For carrying out title IV of the Federal Coal Mine Health and Safety Act of 1969, including the payment of travel expenses either on an actual cost or commuted basis, to an individual for travel incident to medical examinations, and to parties, their representatives and all reasonably necessary witnesses for travel within the United States, Puerto Rico, and the Virgin Islands, to reconsideration interviews and to proceedings before administrative law judges, $967,868,000: Provided, That such amounts as may be agreed upon by the Department of Health, Education, and Welfare and the Postal Service shall be used for payment, in such manner as said parties may jointly determine, of postage for the transmission of official mail matter by States in connection with the administration of said Act.
 
 
 166
 Benefit payments after April 30: For making, after April 30 of the current fiscal year, payments to entitled beneficiaries under title IV of the Federal Coal Mine Health and Safety Act of 1969, for the last two months of the current fiscal year, such sums as may be necessary, the obligations and expenditures therefor to be charged to the appropriation for the succeeding fiscal year.
 
 
 167
 Whenever the Commissioner of Social Security finds it will promote the achievement of the provisions of title IV of the Federal Coal Mine Health and Safety Act of 1969, qualified persons may be appointed to conduct hearings thereunder without meeting the requirements for administrative law judges appointed under 5 U.S.C. 3105, but such appointments shall terminate not later than December 31, 1974: Provided, That no person shall hold a hearing in any case with which he has been concerned previously in the administration of such title.
 
 Id. (Emphasis added.)
 
 168
 See also Pub.L. No. 93-517, 93d Cong., 2d Sess., 88 Stat. 1636 (1974); Pub.L. No. 94-206, 94th Cong., 1st Sess., 90 Stat. 7 (1975).
 
 
 169
 There is no doubt that Congress can authorize a deviation from established law by a provision in an appropriation act. United States v. Dickerson, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); Cella v. United States, 208 F.2d 783, 790 (7th Cir. 1953), cert. denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138 (1954); Tayloe v. Kjaer, 84 U.S.App.D.C. 183, 171 F.2d 343, 344 (1948); NLRB v. Thompson Products, 141 F.2d 794, 797 (9th Cir. 1944). See, e. g., Bayside Enterprises, Inc. v. NLRB, 429 U.S. 298, at n. 6, 97 S.Ct. 576, 50 L.Ed. 494 (1977).
 
 
 170
 Respondents, however, point to the fact that Congress itself has adopted rules in both House and Senate against changing existing law by means of provisions in an appropriation act. This, however, does not serve to warrant our invalidation of the enactments cited or quoted above. The United States Constitution conveys all legislative power to the Congress (U.S. Const. art. I, § 1).[11] The legislative power clearly encompasses Congress' right to make its own rules to change them and to ignore them if it sees fit to do so.
 
 
 171
 Respondent's reliance upon Wong Yang Sun v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), for a contrary result is misplaced. Congress in that case had adopted no act authorizing deviation from the Administrative Law Judge requirement. See id. at 51-53, 70 S.Ct. 445.
 
 
 172
 Faced with a case in which a purported amendment via an appropriation bill had finally been passed after being twice struck from a prior appropriation act on points of order founded on the very rules relied upon by the respondents (United States v. Dickerson, 310 U.S. 554, 558-60, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940)), the Supreme Court concluded that the appropriation act had suspended a section of substantive law, saying at one point:
 
 
 173
 There can be no doubt that Congress could suspend or repeal the authorization contained in § 9; and it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.
 
 
 174
 United States v. Dickerson, supra at 555, 60 S.Ct. at 1035.
 
 
 175
 The Secretary of Labor adopted 20 C.F.R. § 715.101(a)(27) (1976) in pursuance of Congressional authorization cited above:
 
 
 176
 (27) "Hearing officer" means a hearing officer appointed by the Secretary of Labor to conduct formal hearings in respect of claims for benefits under section 415 and Part C of the Act. Wherever the term "administrative law judge" appears in this part or Parts 718, 720 or 725 of this chapter, such term shall have the same meaning as the term "hearing officer." Such hearing officers may or may not meet the requirements for hearing examiners appointed under 5 U.S.C. 3105 but shall, in the opinion of the Secretary, be qualified to carry out the responsibilities and follow the procedures prescribed for administrative law judges by this part and Parts 718, 720, and 725 of this chapter. Hearing officers shall to the extent possible conduct all formal proceedings over which they preside in accordance with the applicable provisions of the Administrative Procedures Act, 5 U.S.C. 554, et seq. as such provisions are interpreted by Parts 720 and 725 of this chapter. Hearing officers shall be organizationally placed in the Office of Administrative Law Judges and shall be under the direct supervision of the Chief Administrative Law Judge of the Department of Labor, Washington, D.C. 20210.
 
 
 177
 We hold that this regulation is entirely consistent with the language of the applicable appropriation acts and within the Secretary's rulemaking power.[12] We note, of course, respondents' argument that the appropriation act amendments should be construed to apply only to hearings pertaining to federal liability for black lung benefits and that a higher standard of hearing officer should or must be employed to hear cases potentially involving the liability of coal operators. We find, however, nothing in the language of the statutes concerned to support this view. We also find no legislative history or common sense to support the argument.
 
 
 178
 In dealing with this same issue, the Seventh Circuit concluded:
 
 
 179
 Because the respondents' narrow reading of the purposes of the appropriations acts cannot stand once their language is traced through all the labyrinthal statutory cross-references, we are constrained to agree with the Director that the authority contained in P.L. 93-192 and its successors amply supports the promulgation of the amended regulation.
 
 
 180
 Indeed, we note that the failure to promulgate a regulation such as 20 C.F.R. § 715.101(a)(27) would have brought the FCMHSA benefits program to a grinding halt and frustrated the Congressional intent that miners and their relatives receive benefits. Even if we regarded the respondents' reading of the appropriations acts as plausible, which we do not, we conclude that they have not overcome the presumptive validity of the contested regulation. See generally Northern Indiana Public Service Co. v. Porter County Chapter of the Izaac Walton League of America, Inc., 423 U.S. 12, (96 S.Ct. 172, 46 L.Ed.2d 156) (1975); Mourning v. Family Publications Service, Inc., 411 U.S. 356, (93 S.Ct. 1652, 36 L.Ed.2d 318) (1973); Federal Communications Commission v. Schreiber, 381 U.S. 279 (1965); Gemsco, Incorporated v. Walling, Administrator of the Wage and Hour Division, U. S. Department of Labor, 324 U.S. 244, (65 S.Ct. 605, 89 L.Ed. 921) (1945); Boske v. Comingore, 177 U.S. 459, (20 S.Ct. 701, 44 L.Ed. 846) (1900); and Giancana v. Johnson, 335 F.2d 372 (7th Cir. 1964).
 
 
 181
 Director v. Peabody Coal Co., supra at 340-41.
 
 
 182
 Accord Krolick Contracting Co. v. Benefits Review Board, 558 F.2d 685, 689 (3d Cir. 1977); Director v. National Mines Corp., supra, 544 F.2d at 1273-75.
 
 
 183
 As to the last of respondents' arguments pertaining to the Administrative Law Judge issue namely, that 5 U.S.C. § 559 (1970) forbids modification of 5 U.S.C. § 3105 we simply point out that the language of the appropriation acts cited and quoted above is an express modification of the § 3105 Administrative Law Judge requirement.
 
 
 184
 As to this issue, the decisions of the Benefits Review Board are reversed and the cases are remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 While the Begley case dealt with claims for benefits for which the Secretary of Health, Education and Welfare was made responsible, the Congressional history is equally applicable to black lung cases required to be processed by the Department of Labor
 
 
 [2]
 These appeals deal with those adjudicatory procedures under the Black Lung Benefits Act of 1972, supra, which are incorporated by reference from the Longshoremen's and Harbor Workers' Compensation Act. 33 U.S.C. §§ 901 et seq. Claims under the Black Lung Benefits Act are adjudicated in one of three ways. Claims filed prior to July 1, 1973, are processed by the Department of Health, Education and Welfare under procedures applicable to regular Social Security disability claims. See 30 U.S.C. §§ 923(b), 925(a) (Supp. V, 1975). Claims filed from July 1 to December 31, 1973, are filed with the Department of Health, Education and Welfare, but are transferred to the Department of Labor to be "determined" by the Secretary of Labor under the adjudicatory procedures of the Longshoremen's Act, supra. 30 U.S.C. § 925(a)(4). (The two claims we deal with in this case were filed between July 1 and December 31, 1973.) Claims filed after December 31, 1973, are to be filed pursuant to the applicable state workmen's compensation law, id. § 931, unless the state's law has not been certified as adequate by the Secretary of Labor, in which case the claim is to be processed under various provisions adopted from the Longshoremen's Act. 30 U.S.C. § 932(a)
 
 
 [3]
 The Longshoremen's & Harbor Workers' Compensation Act, codified at 33 U.S.C. §§ 901 et seq. (1970)
 
 
 [4]
 Act of May 19, Pub.L. No. 92-303, 86 Stat. 153 (codified at 30 U.S.C. §§ 901-941 (Supp. V, 1975))
 
 
 [5]
 Act of October 27, 1972, Pub.L. No. 92-576, 86 Stat. 1251 (codified at 33 U.S.C. §§ 902-948a (Supp. V, 1975))
 
 
 [6]
 To date most black lung cases have reached this court after review by the District Court. These have been cases filed before July 1, 1973, which were processed by the Secretary of Health, Education and Welfare under the same procedures applicable to Social Security disability cases. See 30 U.S.C. §§ 923(b), 925(a) (Supp. V, 1975). Cases filed on or after July 1, 1973, which are just now beginning to reach this court, have all been processed by the Secretary of Labor under the provisions of the Longshoremen's Act, supra. See 30 U.S.C. §§ 925(a)(4), 931, 932(a) (Supp. V, 1975). See also note 2 supra. It is cases of the latter type with which this appeal is concerned
 
 
 [7]
 The District of Columbia Workmen's Compensation Act, 36 D.C.Code §§ 501 et seq., ch. 612, 45 Stat. 600 (1928), also adopts provisions of the Longshoremen's and Harbor Workers' Compensation Act but uses language which expressly includes "all amendments that may hereafter be made." Id. Thus the various cases applying the 1972 Amendments to this Act have less bearing on our problem. See, e.g., Marcus v. Director, 179 U.S.App.D.C. 89, 548 F.2d 1044 (1976)
 
 
 [8]
 This per curiam opinion has been overruled. See Krolick Contracting Co. v. Benefits Review Board, 558 F.2d 685, 689 (3d Cir. 1977)
 
 
 [9]
 Ingalls Shipbuilding Corp. v. Morgan, 551 F.2d 61 (5th Cir. 1977); Director v. Peabody Coal Co., 554 F.2d 310 (7th Cir. 1977); Duluth Missabe & Iron Range Ry. Co. v. U. S. Department of Labor, 553 F.2d 1144 (8th Cir. 1977); Director v. Nat'l Mines Corp., 554 F.2d 1267 (4th Cir. 1977); St. Louis Shipbuilding Co. v. Director, 551 F.2d 1119 (8th Cir. 1977); Sea-Land Service, Inc. v. Director, 552 F.2d 985 (3d Cir. 1977); United Fruit Co. v. Director, 546 F.2d 1224 (5th Cir. 1977); State Ins. Fund v. Pesce, 548 F.2d 1112 (2d Cir. 1977); Maher Terminals, Inc. v. Farrell, 548 F.2d 476 (3d Cir. 1977); Ayers Steamship Co. v. Bryant, 544 F.2d 812 (5th Cir. 1977); Marcus v. Director, 548 F.2d 1044 (D.C. Cir. 1976); Lebel v. Bath Iron Works Corp., 544 F.2d 1112 (1st Cir. 1976); Dravo Corp. v. Maxin, 545 F.2d 374 (3d Cir. 1976), cert. denied, --- U.S. ----, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1976); Director v. Boughman, 545 F.2d 210 (D.C. Cir. 1976); Todd Shipyards Corp. v. Director, 545 F.2d 1176 (9th Cir. 1976); Director v. O'Keefe, 545 F.2d 337 (3d Cir. 1976); Maryland Shipbuilding & Drydock Co. v. Director, 544 F.2d 514 (4th Cir. 1976); Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533 (5th Cir. 1976), vacated on other grounds sub nom. P. C. Pfeiffer Co., Inc. v. Ford, --- U.S. ----, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977) and Director v. Jacksonville Shipyards, Inc., --- U.S. at ----, 97 S.Ct. at 2967, cert. denied sub nom. Halter Marine Fabricators, Inc. v. Nulty, --- U.S. at ----, 97 S.Ct. at 2973; Norfolk, Baltimore & Carolina Lines, Inc. v. Director, 539 F.2d 378 (4th Cir. 1976), cert. denied, 429 U.S. 1078, 97 S.Ct. 823, 50 L.Ed.2d 798 (1976); Sea-Land Service, Inc. v. Director, 540 F.2d 629 (3d Cir. 1976); Stockman v. John T. Clark & Son of Boston, Inc., 539 F.2d 264 (1st Cir. 1976), cert. denied, --- U.S. ----, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977). American Stevedores, Inc. v. Salzano, 538 F.2d 933 (2d Cir. 1976); Atlantic & Gulf Stevedores, Inc. v. Director, 542 F.2d 602 (3d Cir. 1976); Nasem v. Director, 535 F.2d 1250 (4th Cir. 1976); Barthelemy v. Director, 537 F.2d 168 (5th Cir. 1976); Tampa Ship Repair & Dry Dock Co. v. Director, 535 F.2d 936 (5th Cir. 1976); Nacirema Operating Co. v. Benefits Review Board, 538 F.2d 73 (3d Cir. 1976); Landrum v. Air America, Inc., 534 F.2d 67 (5th Cir. 1976); Presley v. Tinsley Maintenance Service, 529 F.2d 433 (5th Cir. 1976); Evening Star Newspaper Co. v. Kemp, 175 U.S.App.D.C. 89, 533 F.2d 1224 (1976); Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, 535 F.2d 758 (3d Cir. 1976); McCord v. Cephas, 174 U.S.App.D.C. 302, 532 F.2d 1377 (1976), preliminary motion to dismiss the Benefits Rev. Bd. granted sub nom. McCord v. Benefits Review Board, 168 U.S.App.D.C. 302, 514 F.2d 198 (1975); Weyerhaeuser Co. v. Gilmore, 528 F.2d 957 (9th Cir. 1975), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976); Potenza v. United States Terminals, Inc., 524 F.2d 1136 (2d Cir. 1975); DuPuy v. Director, 519 F.2d 536 (7th Cir. 1975), cert. denied, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976)
 
 
 [10]
 See also Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 42 n.5 (2d Cir. 1976), cert. granted on other issues, 429 U.S. 998, 97 S.Ct. 522, 50 L.Ed.2d 607 (1976). While obviously we disagree with the dictum in this footnote, we do agree that "the Department . . . (should) tidy up its regulations."
 
 
 [11]
 This power is subject only to Presidential veto, a right which the President did not employ in these instances. See U.S. Const. art. I, § 7
 
 
 [12]
 For the Secretary's rulemaking authority, see 33 U.S.C. § 939(a) (1970); 30 U.S.C. §§ 932(a), 936(a) (Supp. V, 1975); cf. 30 U.S.C. § 925(a)(4) (Supp. V, 1975) (adjudicative procedures of the Longshoremen's Act to be used in Black Lung Act cases under this section "to the extent appropriate"). See also 5 U.S.C. § 301 (1970) (general rulemaking authority)